Jonathan Keith CARTER; Theresa Jean Carter; and Danny Ray Carter, all minors by and through their paternal grandmother and next-of-friend, Gertrude Carter, Plaintiffs–Appellants, Cross–Appellees,

v.

UNIT RIG & EQUIPMENT COMPANY, a Texas corporation, Defendant–Appellee, Cross–Appellant.

Nos. 84–2463, 84–2639.

United States Court of Appeals, Tenth Circuit.

April 18, 1990.

Alan Epstein, Hall & Evans, Denver, Colo. (L. Richard Musat, Hall & Evans, Denver, Colo., David W. Griffith, Williams, Trine, Greenstein & Griffith, Boulder, Colo., were also on the brief), for plaintiffs-appellants, cross-appellees.

Michael T. McConnell, Long & Jaudon, Denver, Colo., for defendant-appellee, cross-appellant.

Before HOLLOWAY, Chief Judge, McWILLIAMS and EBEL, Circuit Judges.

HOLLOWAY, Chief Judge.

## I

Seeking damages from the defendant Unit Rig & Equipment Company ("Unit Rig" or the "company") and General Electric for the wrongful death of her son, Terry Carter, plaintiff Gertrude Carter commenced this product liability action as next friend on behalf of her three grandchildren on July 15, 1981. Originally both General Electric and Unit Rig were named as defendants. In March 1984 the district court approved a settlement pursuant to which General Electric paid $20,000 to the plaintiff and received a dismissal with prejudice.

The defendant Unit Rig & Equipment Co. manufactured the truck in which Terry Carter was killed on July 18, 1979, in an accident at the Climax Mine in Colorado. The jury found Unit Rig liable for Terry's death and assessed damages in the amount of $366,667. Applying Colorado's comparative fault statute ("Section 406"),[1] the jury found the decedent Terry 88 percent re-sponsible for the fatal accident and Unit Rig 12 percent responsible. After subtracting $20,000 from the $366,667 figure to reflect the settlement with General Electric, the district court entered a judgment of $41,600 (12% of $346,667) for the plaintiff.[2]

On appeal, plaintiff Gertrude Carter asserts two major claims of error. She argues that the district court (1) misconstrued Colorado's comparative fault statute and improperly instructed the jury to consider Terry's contributory negligence for purposes of apportioning responsibility for the accident; and (2) erroneously refused to submit plaintiff's tendered sudden emergency instruction. Carter asserts, moreover, that this court should certify the issue of the construction of Section 406 to the Supreme Court of Colorado.

In its cross-appeal Unit Rig challenges the district court's decision to make the $20,000 reduction from the $366,637 award to reflect the settlement with General Electric. The company argues that Colorado law mandates the reduction of $20,000 be made from the $44,000 (12% of the entire $366,667) figure for which the jury found Unit Rig liable in its special verdict regarding comparative fault.

We do not agree that the trial judge misconstrued Section 406. However, we are convinced the court erred in refusing to instruct the jury on the sudden emergency doctrine as requested, and must remand for a new trial. We also provide that on remand, consideration be given to whether in the circumstances of this case any setoff should be allowed at all.

## II

From June 1970 until his death in July 1979, Terry Carter worked in various capacities for the Climax Molybdenum Company at its open pit mining site in Climax, Colorado. In May 1977, Terry completed

---

1. Colo.Rev.Stat. § 13–21–406 (1980 & Supp. 1988) (Comparative Fault as Measure of Damages).

2. 
| Total damages assessed: | $366,667.00 |
|---|---|
| G.E. settlement: | − $ 20,000.00 |
| | 346,667.00 |
| Multiplied by 12% | × .12 |
| Damages owed by Unit Rig: | 41,600.00 |

the company truck driver training program and was permitted to operate trucks of 100 tons or more thereafter. Although it is not clear from the trial record precisely how much cumulative time Terry spent as a truck driver, it appears that he did not work continuously in that capacity, and that at the time of the accident he had only been driving the truck in which he was killed for one uninterrupted week. *See* XXI R., defendant's exhibit C5.

The truck Terry was operating in July 1979 was the Lectra Haul M–120, manufactured by Unit Rig. The truck is over 34 feet long and weighs approximately 200 tons when fully loaded. The truck operator is situated 17 feet off of the ground. The vehicle was used to haul ore from the open pit molybdenum mine to a processing point some distance away. The M–120 is equipped with two braking systems. The first is a mechanical disc braking system which is roughly similar to those found in automobiles. The second is a specially-designed dynamic retarding technology that employs electrical energy to retard the movement of the M–120's wheels.[3]

Climax drivers are instructed to use the mechanical brakes at speeds of three miles per hour or less and to use the dynamic retarder at higher speeds. The mechanical brakes are only to be used at speeds above three miles per hour in emergency situations because these brakes are ruined at higher speeds and must be replaced if so used, at considerable expense to the Climax Company. In such an emergency the mechanical brakes can theoretically stop the vehicle at speeds up to 30 miles per hour. When operating the M–120 on a downward grade, drivers are instructed never to allow the truck to coast, and never to allow the

vehicle to travel at speeds of more than 15 miles per hour. If the truck exceeds 15 miles per hour, the M–120's dynamic retarder brakes are designed to engage automatically, at approximately 18 to 19 miles per hour, without any activation by the driver.

There were no eyewitnesses to Terry's fatal accident on July 18, 1979. However, it is undisputed that on that day, he was driving a fully-loaded M–120 down a ten percent grade when he informed his dispatcher by radio that he was "losing his dynamics," in those words or words to that effect. The radio transmission ceased, and the next contact with Terry occurred shortly thereafter when co-workers discovered the M–120 overturned at the bottom of the grade. Having sustained a basal skull fracture, Terry was pronounced dead on arrival at the Climax infirmary.

The speed at which Terry was traveling at the time of the tragedy is not known. Nor is it known when or if Terry used either or both of the M–120's braking systems; nor when, if, and/or to what extent the vehicle's dynamic retarder system engaged automatically. Plaintiff Carter infers from the available facts that the accident resulted from design defects in the M–120 and failure to warn M–120 drivers of the implications of these design defects. It is argued that Carter had insufficient warning of the dynamic retarder's failure to slow the M–120 adequately. Unable to rely on the dynamic retarder, and dissuaded from using the mechanical brakes under any but the most dire circumstances, it is inferred either that (1) one or both of the braking systems failed or that (2) Terry inadvertently waited too long to engage the mechanical brakes (because the M–120

---

**3.** Dynamic retarding technology is cogently explained as follows in the Answer Brief of the Defendant:

> Dynamic retarding works by switching the electric wheel motors (which consume electricity) to electric generators (which produce electricity). Dynamic retarding was activated by pressing a foot pedal in the cab. When the truck was moving (i.e., the wheels were rotating) and the driver activated dynamic retarding, the moving wheel motors were switched to generators and began producing electric

> current. That electric current was routed to a large grid of electrical resistors which slowed the rotation of the wheels.

Answer Brief of Defendant–Appellee at 4 (distillation of expert testimony of S.D. Buchanan, an electrical engineer, at Vol. XII, pp. 7–12). This description of the operation of the dynamic retarder also comports with that set forth in the testimony of Richard Crawford, Professor of Mechanical Engineering, University of Colorado, VIII R. 19–20.

lacked any type of unambiguous indicator of the status of the dynamic retarder's operation), and the vehicle's momemtum rendered it unstoppable.

Unit Rig infers from the same facts that Carter did have adequate warning of the functioning or failure of the dynamic retarder, because the engagement of the dynamic retarder could be felt and heard by a competent driver of the M–120. Unit Rig says the accident resulted not from any failure of design or warning, but from Terry's having negligently exceeded the 15 mile-per-hour speed limit and then having failed to remedy his negligent error in time by engaging the mechanical brakes.

## III

### *Plaintiff Carter's Appellate Issues*

### *Comparative Fault*

■ As in *Huffman v. Caterpillar Tractor Company*, 908 F.2d 1470 (10th Cir. Nos. 86–2630 and 2658), decided today, plaintiff Carter's central argument on appeal is that the district court's jury instructions regarding the issue of comparative fault erroneously stated the law of Colorado under its comparative fault statute, C.R.S. § 13–21–406 (1980 & 1988 Supp.).[4] Plaintiff says that ordinary contributory negligence does not constitute "fault" in a strict product liability action. The argument made by the plaintiff is that the trial court should not have submitted the issue of Terry's comparative fault to the jury because Terry's conduct, which plaintiff characterizes as "ordinary contributory negligence," does not constitute "fault" as that term is employed in Section 406. For reasons similar to those given in our analysis of Section 406 in the *Huffman* opinion, we cannot agree.

The relevant passage of C.R.S. § 13–21–406 reads as follows:

**Comparative fault as measure of damages.** (1) In any product liability action, the *fault* of the person suffering the harm, as well as the fault of all others who are parties to the action for causing the harm, *shall be compared* by the trier of fact in accordance with this section. The fault of the person suffering the harm shall not bar such person, or a party bringing an action on behalf of such a person ... from recovering damages, but *the award of damages* to such person or the party bringing the action *shall be diminished in proportion to the amount of causal fault attributed to the person suffering the harm.* If any party is claiming damages for a decedent's wrongful death, the fault of the decedent, if any, shall be imputed to such party. * * * *

§ 13–21–406 C.R.S. (1980 & 1988 Supp.) (emphasis added).

On consideration of the statute's broad language and the legislative history of C.R.S. § 13–21–406,[5] we are not persuaded to adopt the construction urged by the plaintiff Carter. The statute does not define the term "fault." We cannot find any indication that the General Assembly intended to exempt a plaintiff's contributory negligence from consideration as "fault" for purposes of determining damages. As we stated in *Huffman*, "the term 'fault,' as employed in C.R.S. § 13–21–406, is more plausibly construed as a general term encompassing a broad range of culpable behavior including, but not limited to negligence." *Huffman*, at 1477 (footnotes omitted).[6] As we noted in *Huffman*, at 1474–

---

**4.** While we conclude we must reverse on other grounds and remand for a new trial, we treat this comparative fault issue which will likely be present on retrial.

**5.** *See generally,* Tape Recordings of Senate Business Affairs and Labor Committee, Feb. 10, 16, 1981.

**6.** As noted in *Huffman,* at 1477 n. 15, we find support for our approach to the comparative fault statute in the analysis of the Colorado Supreme Court Committee on Civil Jury In-

structions in its Special Note to Colorado Civil Jury Instruction 14:30:

The Committee recognizes that the General Assembly left unanswered many issues posed by the "comparative fault" statute (C.R.S. Sec. 13–21–406) and that the appellate courts have not yet had an opportunity to rule on these issues. The Committee's intent in drafting these instructions is not to resolve these issues but to provide the Bench and Bar with a basic structure from which to work in formulating appropriate instructions for the jury. * * *

1475, Colorado decisions earlier did not apply comparative negligence principles in strict liability suits, *e.g. Kinard v. Coates,* 37 Colo.App. 555, 553 P.2d 835, 837–38 (1976), but we are convinced that the broad terms of the 1981 comparative fault statute of Colorado employed in C.R.S. 13–21–406 effected a change and its terms encompass a broad range of culpable behavior including, but not limited to, negligence. In *Huffman* we noted the breadth of the term "fault" by reference to its common meaning reflected in dictionary definitions. *Huffman,* at 1476, n. 12 (definitions of fault include, *e.g.,* "neglect," "failing," "a failure to do something required by law or the doing of something forbidden by law").

There is some merit to the plaintiff's point that the doctrine of contributory negligence has been superseded by Colorado's adoption of a comparative fault regime. This is true in the sense that at common law, contributory negligence was an affirmative defense that could bar *any* recovery by a plaintiff who was found to have negligently contributed to his own injury. Comparative fault regimes such as that set forth in Section 406 reject the harsh common law doctrine of contributory negligence as a complete bar and instead direct juries to discount a plaintiff's recovery by the percentage of fault that can be attributed to the plaintiff's culpable conduct.

Nevertheless the fact that the traditional contributory negligence doctrine has been superseded does not mean that Colorado juries are precluded from considering the negligent behavior of a plaintiff for purposes of apportioning damages in product liability cases. As stated in *Huffman,* we are persuaded that it was the intention of the General Assembly that the negligence of product liability plaintiffs should be con-

sidered under C.R.S. § 13–21–406, and that damage awards are to be reduced to the extent that a plaintiff is found to have been responsible for his own injury. *Huffman,* at 1477.

Plaintiff Carter argues that the question of construction of Colorado's comparative fault statute should be certified for determination by the Supreme Court of Colorado. We do not agree. In light of the substantial support we find for the statutory interpretation made by the district court, which we uphold, we decline the request to certify the question and affirm the statutory construction made below for the reasons we have stated in *Huffman* and here.

### Refusal of the Sudden Emergency Instruction

■ The plaintiff further argues that there was evidence on which the jury could have found that Terry Carter was confronted with circumstances amounting to a sudden emergency; it was, therefore, reversible error for the trial court to refuse to give the plaintiff's sudden emergency instruction.[7]

"The rule of sudden emergency is applicable when, without tortious conduct on his part, one is suddenly and unexpectedly placed in a perilous situation requiring instant action without the exercise of deliberate judgment." *Hopkins v. Metcalf,* 435 F.2d 123, 124 (10th Cir.1970) (applying Oklahoma law). Stated another way,

> ... one who without fault on his part, is suddenly and unexpectedly placed in a perilous situation, so as to be compelled to act instantly and without an opportunity for the exercise of deliberate judg-

CJI–CIV.2d 14:30 (1980 & 1988 Supp.).
    In *Huffman,* we also cited legislative history and other support for our interpretation of the comparative fault statute as covering a broad range of culpable conduct, including but not limited to, negligence. See *Huffman,* at 1477, nn. 16 and 17.

7.  The specific instruction tendered by the plaintiff read as follows:
    A person who, through no fault of his own, is placed in a sudden emergency, is not

chargeable with fault if he exercises that degree of care which a reasonably careful person would have exercised under the same or similar circumstances.
T.R. Vol. I at 94. This is verbatim the sudden emergency charge as stated in the Colorado Jury Instructions. CJI–CIV2d 9:10 (1980); *see also Cudney v. Moore,* 163 Colo. 30, 428 P.2d 81, 82 (1967) (approved by the Colorado Supreme Court of a similarly phrased sudden emergency instruction).

ment, is not chargeable with negligence if in attempting to escape from the peril or to avoid or minimize the threatened injury he acts as a person of reasonable prudence would or might have acted in the same or a similar situation.

Annotation, *Instructions on Sudden Emergency in Motor Vehicle Cases*, 80 A.L.R.2d 5, 12 (1961).

The district judge's order denying Carter's motion for a new trial, II R. at 162, 166, stated the basis for his refusal of the sudden emergency instruction as follows:

The doctrine of sudden emergency would not apply in this case. Evidence revealed that the speed limit on Ceresco Ridge Road [where the accident occurred] was 15 m.p.h. Also, *evidence was introduced to show that several seconds lapsed between the time the truck's brakes failed and the time the truck became "runaway."* No other vehicles were on the road in the vicinity of Terry Carter's truck. I think this situation is not one in which "instantaneous" action must be taken without any exercise of deliberate judgment. Therefore, the Court's failure to give plaintiff's sudden emergency instruction was not improper.

II R. at 166 (emphasis added).

We must disagree with the action of the trial judge in rejecting the requested instruction. The judge noted that there was evidence of brake failure and that only "several seconds" lapsed before the truck became "runaway." In light of the testimony and reasonable inferences from it, there was sufficient evidence to call for submission of the issue. In ruling as he did, the trial judge in effect determined a factual issue sufficiently raised to call for resolution by the jury, with proper submission of the issue.

Our research has revealed no Colorado authority for the proposition that there is a meaningful difference between an "instant" and "several seconds" for purposes of applying the sudden emergency doctrine. What is clear from the Colorado cases we have reviewed is that where there is some evidentiary basis for finding a sudden emergency to have existed, the question is

one for the finder of fact. *See e.g., Tracy v. Graf,* 37 Colo.App. 323, 550 P.2d 886, 890 (1976), *rev'd on other grounds,* 194 Colo. 1, 568 P.2d 467 (1977) (*en banc*), ("it was for the jury to determine, under the circumstances, whether an unforeseen emergency existed, and if so, whether defendant was at fault for its creation."); *Kaesik v. Halbert,* 513 P.2d 242, 244 (Colo.App.1973); *Peek v. Forbes,* 470 P.2d 85, 86 (Colo.App. 1970) ("the existence of an emergency is to be determined by the trier of fact if there is evidence from which it could be reasonably found that an emergency existed"); *Bartlett v. Bryant,* 166 Colo. 113, 442 P.2d 425, 427 (1968); *Cudney v. Moore,* 163 Colo. 30, 428 P.2d 81, 83 (1967). *See also, Daigle v. Prather,* 152 Colo. 115, 380 P.2d 670, 672 (1963) (finding sudden emergency instruction appropriate where there was evidence of brake failure); *accord,* Annotation, *Instructions on Sudden Emergency in Motor Vehicle Cases,* 80 A.L.R.2d 5, 47 (1961) ("a peril arising by reason of the defective condition or the malfunctioning of a vehicle may constitute an emergency"). Thus substantively there was evidence of circumstances which could be found to have been a sudden emergency under Colorado law. And, under federal procedure, a proper instruction being requested in a case where the evidence was sufficient to raise the issue, the instruction should have been given. *Hopkins,* 435 F.2d at 125.

The precise circumstances which led to Terry Carter's death are unknown. The question is whether there was sufficient evidence presented at trial upon which the jury could have found that Terry was faced with a sudden emergency shortly before his death. *See Kaesik v. Halbert,* 513 P.2d 242, 244 (Colo.App.1973) (jury properly instructed to consider both contributory negligence and sudden emergency where sudden emergency was raised as defense to alleged contributory negligence); Annotation, *Instructions on Sudden Emergency in Motor Vehicle Cases,* 80 A.L.R.2d 5, 20 (1961) ("the [sudden] emergency rule may be invoked as a defense against a charge of either primary or contributory negligence at the instance of either the plaintiff or the defendant"). Where there is sufficient evi-

dence for the jury to find that a sudden emergency confronted a party, he is entitled to an instruction on that issue. *Hopkins v. Metcalf,* 435 F.2d 123, 124–25 (10th Cir.1970). And if the jury found that such a sudden emergency confronted Terry, it would exculpate the plaintiff from the large reduction of the judgment here.

There was testimony by witness Acrey relating a radio communication he heard from Terry stating, "I am losing my dynamics." VI R. 110. Eight to ten seconds later, Terry said, "I have lost my dynamics." VI R. 113. It sounded as though Terry was shouting over a noise. *Id.* Following advice then to "[g]et on your brakes," Terry replied, "I am on 'em." *Id.* at 114–15. The inference that Terry was confronted by an emergency was clearly justified. This situation is strikingly similar to that of the brake failure circumstances in *Daigle. v. Prather,* 380 P.2d at 672, where a sudden emergency instruction was held proper.

Moreover there was expert testimony by a mechanical engineering professor that, in his opinion, Terry lost his "dynamics" on the M–120 about the time he applied them, at "approximately 15 miles an hour; that they became disconnected." He said then that the mechanical brakes failed "approximately 2400 feet from the curve down." X R. 48–49. Professor Crawford further testified that in his opinion the cause of Terry's accident was lack of a warning light or system to inform the driver he had "lost his dynamics" and was approaching a speed at which he could not control his vehicle, adding "he had very little time to function or to make this analysis...." X R. 14.

We are convinced that there was sufficient evidence so that the jury could have found that Terry was confronted with a sudden emergency. In such circumstances the issue must be submitted to the jury. *See Sanchez v. Safeway Stores, Inc.,* 451 F.2d 998, 1000 (10th Cir.1971); *see also, Long v. Hank,* 457 F.2d 40, 42–43 (10th Cir.1972); *Hopkins v. Metcalf,* 435 F.2d 123, 124–25 (10th Cir.1970). As we held in *Hopkins,* "[w]e are convinced that the fail-

ure to give the requested instruction on sudden emergency was an error prejudicial to the plaintiff's substantial rights." *Hopkins,* 435 F.2d at 125.

### IV

#### *Unit Rig's Cross–Appeal*

■ The remaining issue is the proper setoff to be made due to the $20,000 pretrial settlement payment made by General Electric to plaintiff Carter. The reversal we feel required to make for a new trial will set aside the judgment and setoff determination, but since this issue may arise again on the retrial of this case, we will discuss the setoff question.

The issue raised in Unit Rig's cross-appeal concerns the extent to which plaintiff Carter's pretrial settlement with General Electric should reduce the damages payable by Unit Rig. The trial judge determined that the $20,000 settlement paid by General Electric should be deducted from the total damage award by the jury of $366,667. Then, since Unit Rig was found to be 12 percent at fault by the jury, the judge determined that Unit Rig's liability should be $41,600 (12% of $346,667).

Unit Rig contends that the court erred in deducting the $20,000 settlement from the full $366,667 award before the reduction for Terry's comparative fault. The proper course, Unit Rig says, would have been to deduct the $20,000 from the ultimate determination of damages after the reduction for Terry's comparative fault. That amount was $44,000 (12% of $366,667) and Unit Rig argues that the $20,000 setoff should be made to that $44,000 figure for a $24,000 final award.

This setoff issue must be decided under the 1977 version of Colorado's Contribution Act, C.R.S. 13–50.5–101, *et seq.,* rather than under the current version of the Contribution Act reflecting the 1986 amendments, C.R.S. 13–21–111.5(1) (1987); C.R.S. 13–50.-5–105(1)(a) (1987). Under Colorado law "[a] statute is presumed to be prospective in its operation." C.R.S. 2–4–202; C.R.S. 2–4–303 (1980 & 1989 Supp.) (liability incurred under a statute is not altered or

extinguished by repeal or amendment of such statute unless amending or repealing statute expressly so provides); 7 J. MILLER, COLORADO PERSONAL INJURY PRACTICE, §§ 14.28–14.29 (1989) (in cases "commenced on or after July 1, 1986," the 1986 amendments to the Contribution Act are applicable). Section 13–50.5–105 of the 1977 Colorado Contribution Act provided in part as follows:

(1) When a release or covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:

(a) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater...."

Under this statute there is a question in some instances whether any setoff should be allowed. In *Kussman v. City and County of Denver*, 706 P.2d 776, 782 (Colo. 1985) (*en banc*), the court held that "where judgment is rendered against a tortfeasor for no more than its proportionate share of liability, it is not eligible for deduction of the settlement amount from the judgment." However, we are not persuaded that such a rule applies here. In the *Kussman* case there were special circumstances in that the City's defense resulted in the liability for the plaintiff's injury being divided into "two independent components," the City's liability and liability of a driver imputed to the plaintiff. 706 P.2d at 780. As a result, liability was divided according to fault and judgment was rendered against the City for no more than its independent portion of the liability to the plaintiff. Hence, joint or several liability for the entire damages for the plaintiff's injury was erased. 706 P.2d at 780. Therefore, the condition for reduction of the claim pursuant to Section 13–50.5–105(1)(a), was erased and no setoff was allowed. The "common liability" giving rise to a right of contribution, and similarly under the setoff statute to a right of setoff, did not exist in *Kussman*. 706 P.2d at 780.

We do not have such circumstances here. The pretrial settlement made by the plaintiff Carter with General Electric did not occur in a case where there was a determination of two independent components of liability for the wrongful death, the alleged liability of Unit Rig and alleged liability of General Electric. Instead, where the only injuries involved are those for which all tortfeasors are jointly or severally liable, the settlement amount or amount provided for in the settlement document, whichever is greater, must be deducted from the total judgment against the remaining tortfeasors. *Perlmutter v. Blessing*, 706 P.2d 772, 775 (Colo.1985) (*en banc*).

We are not persuaded by Unit Rig's argument, and instead we conclude that the trial judge here properly made the setoff from the entire judgment. Unit Rig relies on *Hauser v. Public Service Company of Colorado*, 797 F.2d 876 (10th Cir.1986). It is true that in *Hauser* the ultimate damage award approved by this court was arrived at with a setoff made after a reduction of the plaintiff's judgment for his comparative negligence. However, the argument Unit Rig makes here was not actually ruled on in *Hauser*. There the error found was that only a figure used for the calculation of interest was amended to reflect the $50,000 settlement payment in that case. 797 F.2d at 880. The *Hauser* opinion cited *Perlmutter v. Blessing*, 706 P.2d 772, 776, and its interpretation that the phrase "claim against the other [tortfeasors]" in C.R.S. § 13–50.5–105(1)(a) as meaning "to comprise the entire judgment ..." whether or not the original defendants were jointly and severally liable. *Id.* at 880–81.

We are satisfied that the trial judge made the proper setoff in conformity with the Colorado decisions construing the 1977 statute which applies here, § 13–50.5–105. The Colorado Court does refer to "the entire judgment" in interpreting the "claim against the other tortfeasors" which the statute requires to be reduced by reason of the settlement payment. *Perlmutter*, 706 P.2d at 775, 776. Moreover, this same set-

off interpretation made by the trial judge here was also made by another federal district judge in *Alling v. American Tool and Grinding Co., Inc.*, 648 F.Supp. 1344, 1348–49 (D.Colo.1986). We feel that the setoff determination made by the trial judge here was proper under Colorado law. Therefore if a plaintiff's verdict and a finding of comparative negligence by the plaintiff result on retrial, the $20,000 setoff should be made against the entire original judgment for the plaintiff before the comparative negligence reduction.

Accordingly, the judgment is REVERSED and the case is REMANDED for further proceedings in accord with this opinion.